**STATE of Missouri, Respondent,**

v.

**Kenneth Lloyd RIGGS, Appellant.**

**No. 10877.**

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 27, 1979.

John D. Ashcroft, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, for respondent.

Robert W. Evenson, Pineville, for appellant.

TITUS, Presiding Judge.

Tried as a habitual criminal (§ 556.280 RSMo 1969), defendant was jury-convicted of second degree burglary (§ 560.045 RSMo 1969), and burglarious stealing. § 560.110 RSMo 1969. Defendant was court-sentenced to consecutive prison terms of 5 years for burglary and 4 years for stealing. This appeal ensued.

Upon returning to her rural Newton County home the evening of June 13, 1977, Miss Webb discovered her record player and 57 record albums were missing. (She later discovered a floor fan was missing also). Deputy Sheriff Pearman responded to her summons. From talking with neighbors German and Winchester, the deputy learned they had seen a white-over-maroon pickup truck parked at the Webb residence earlier in the day. Mrs. German also advised that she had observed the male truck driver (whom she later identified as being defendant) loading objects into the pickup.

The following day, June 14, witness Winchester again saw the same pickup, followed it and noted the names "Jim and Sue Irwin" were printed on the side. (This truck was identified at trial as having been sold to defendant by a deputy reserve sheriff on June 10, 1977). After this was reported to Deputy Pearman and pursuant to other information acquired in his investigation, the deputy interviewed a Mrs. Yust who recounted that the previous evening (June 13), at defendant's invitation, she and her husband had gone to defendant's house to listen to recordings on a player that defendant represented he had just purchased for $30. (At trial, Mrs. Yust identified Miss Webb's player as the one she had seen at defendant's house).

Armed with the accumulated information, supra, Pearman, another deputy and the sheriff, drove to defendant's bucolic home the afternoon of June 14 and contacted defendant's wife. While awaiting defendant's arrival, the other deputy, from outside the home and by looking through a window, espied the reported purloined record player in the living room. When defendant arrived home driving the pickup previously described, he was arrested and advised of his rights. Because it was raining, the three officers and defendant et uxor sat in the sheriff's vehicle while inquiry was made concerning the necessity vel non of obtaining a warrant to search the house for the stolen player and records. According to the officers, and as concluded by the trial court, defendant consented to the warrantless search. One deputy and the sheriff accompanied defendant into the house to obtain clothing in anticipation of incarceration. Another officer accompanied defendant's wife to the living room to obtain the player and the records which defendant's wife sorted out to be those that purportedly had been stolen.

The morning following his arrest, i. e., June 15, defendant was again advised of his rights. In his memorandum as to what defendant said on the 15th, Deputy Pearman, inter alia, wrote: "After he gave this [information regarding another burglary and stealing] I asked if he wanted to give [a] statement on the Webb house and he said not until he talked to his lawyer but that he got a fan from the house and when we got the rest of the stuff from the other

[defendant's] house we might as well get the floor fan all so [sic]. Stated he got it out of the front room all so [sic]." The amended information upon which defendant was tried accused him of stealing the record player and 57 record albums; no mention was made of stealing the floor fan.

Defendant's first two points relied on asseverate that the trial court erred in permitting, over objection, the prosecuting attorney, in his opening statement, and Deputy Pearman, in his testimony, to allude to defendant's oral statement, supra, relative to the fact he had also stolen the floor fan from Miss Webb's home. Defendant says this was error because the court, ere trial, had sustained his motion *in limine* to cause the prosecutor and state witnesses to refrain from referring to " . . . any items of alleged stolen property other than set forth in the amended information filed herein which may have been found at the residence of Defendant" because it would allow "the jury to consider a reference to another crime not charged in the information, nor established by the evidence by proper foundation laid by the state . . . ."

The Latin phrase "in limine" is defined to mean "In or at the beginning." Bouvier's Law Dictionary, Baldwin's Ed. 1934, p. 530. Such a motion with no title save "in limine", apparently is designed, at the beginning of litigation, to accomplish some purpose which may be known only by reference to the context thereof. When so viewed, the pleading here was nothing more or less than a highfalutin motion to suppress designated testimony or evidence. However, sustention of such a motion does not per se work as a permanent damnation of the evidence sought to be suppressed. Neither does sustention prevent the trial court from later changing its mind. The pretrial ruling is interlocutory only. Additional information or trial-produced evidence may prompt the trial court to alter its pretrial ruling by admitting the previously objected-to testimony. Such change of mind does not automatically work to convict the trial court of error. *State v. Howell,* 524 S.W.2d 11, 19[6] (Mo. banc 1975).

Defendant's objection to the state's opening statement and the testimony of Deputy Pearman regarding his declamation to the officer that he "might as well get the fan I took from [Miss Webb's house] too", is without merit. The evidence established the fan had been stolen at the same time the player and records were taken and defendant's admission went to prove he had put the fan in his residence at the place where the player and records were recovered. This evidence was admissible to connect defendant with possession of the items enumerated in the information. *State v. McBride,* 366 S.W.2d 374, 378[7] (Mo.1963); *State v. Hedgpeth,* 311 Mo. 452, 459, 278 S.W. 740, 742[4, 5] (1925). Defendant could not have been convicted of stealing the fan because Instruction No. 6, which submitted the issue of whether he was guilty in connection with the burglary, specifically limited the jury's consideration to whether he stole the player and records which were the only articles itemized in the information. *State v. Johnson,* 447 S.W.2d 285, 292 (Mo. 1969). Defendant's points I and II are denied.

Defendant's third and final point relied on contends that the trial court erred in not suppressing the record player and albums as evidence because they were seized in an unlawful search of defendant's residence as any consent he may have given to the search was involuntary and was the result of coercion on the part of the sheriff and two deputies. The trial court held an extensive hearing on defendant's motion to suppress. As in determining the correctness of the court nisi's ruling on a motion to suppress a confession, unless it appears that manifest error has been committed we defer to the trial court's obvious acceptance or rejection of the credibility of witnesses on conflicting testimony relative to whether defendant's consent to search was voluntarily given. *State v. Crowley,* 571 S.W.2d 460, 465[13] (Mo.App.1978).

Borrowing liberally from Hogan, J., author of *State v. Pinkus,* 550 S.W.2d 829,

835–836[3–7] (Mo.App.1977), we note the following: "To determine whether a criminal defendant has voluntarily consented to a search, a court looks to the 'totality of all the circumstances', . . . which means, we suppose, that the presence or absence of persuasion or compulsion is always subjective. . . . Factors to be considered are the number of officers present, the degree to which they emphasized their authority, whether weapons were displayed, whether there was any fraud on the part of the officers, the acts and statements of the person giving consent, and other matters comprising the so-called 'totality of the circumstances'. . . . The defendant claims that at least [two] officer[s'] weapons [were] exposed [but testified the guns were kept in holsters at all times and never used or pointed at him]. The fact that the officers were carrying sidearms does not constitute coercion in the absence of a display of those weapons. . . . The number of officers present [at defendant's house when the search was conducted—here three] is one factor bearing on the existence of coercion, . . . but this factor alone is not determinative, and the presence of a group of officers upon the premises, without more, does not render [defendant's] consent involuntary. . . . [The evidence by the state was that after defendant was arrested outside his home and given his rights, he was asked if the officers needed to get a search warrant or if he would give them the player and the records. To this, defendant replied that if the officers permitted him to change clothing, they could have the requested items. This constituted] no evidence of any suggestion of dire consequences if defendant did not consent. . . . Fairly read, the record shows 1) that defendant's consent was given at [his] home, 'not in the confines of [a] police station [or county jail]', . . .; 2) that [he] had not been subjected to custodial interrogation and no threats were made; 3) the arresting officers did not undertake any show of force and did not emphasize their authority; 4) there was no evidence of any fraud or misleading on the part of the officers; . . . . Considering the 'totality of the circumstanc-es', the defendant's consent to the search was entirely voluntary." Defendant's point III is denied.

Judgment affirmed.

All concur, except PREWITT, J., not participating because not a member of the court when cause was submitted.