**STATE of Missouri, Appellant,**

v.

**Kenneth FIGGINS, Respondent.**

**No. WD 45273.**

Missouri Court of Appeals,
Western District.

Aug. 18, 1992.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Sept. 29, 1992.

Application to Transfer Denied
Nov. 24, 1992.

Albert A. Riederer, Pros. Atty., Robert Frager, Asst. Pros. Atty., Kansas City, for appellant.

Mary D. Curtis, Asst. Public Defender, Kansas City, for respondent.

Before SHANGLER, P.J., and KENNEDY and SMART, JJ.

SHANGLER, Presiding Judge.

On September 8, 1988, the defendant Figgins was arrested on a charge of felony escape. He was then taken to the Raytown Police Department for questioning. Before the questioning began, his tennis shoes were seized. The police seized them in order to make a shoe print comparison with the footprint left at the scene of a murder they were investigating. A knife seized from Figgins was compared with knife cuts made on a screen window at the scene of the crime. The questioning began at 9:47 p.m. on September 8, 1988, and lasted until 11:18 p.m. on September 9, 1988, at which time the defendant confessed his role in several crimes in the Raytown area. Figgins now stands accused of one count of murder in the first degree, five counts of burglary in the first degree, four counts of armed criminal action, and one count of stealing a motor vehicle.

Figgins brought a motion to suppress statements and physical evidence. The trial court sustained the motion and ordered suppressed Figgins' statements to the police and certain items of evidence seized by them. The state through the prosecuting attorney appeals the order of suppression. § 547.200.1, RSMo 1986.

The motion to suppress asserted six specific grounds.[1] The order to suppress rests upon grounds two and three:

1. *See* Appendix A.

Two, the defendant invoked his right to remain silent and this request was not scrupulously honored.

Three, the defendant invoked his right to an attorney and such request was not scrupulously honored.

An area metro squad was formed on September 6, 1988, following a series of burglaries in the Raytown area and the homicide of Donald Frank Benedict. Figgins became a target of the investigation as they followed some leads in the case, including a car chase in the vicinity of the crime scene on the night of the homicide involving the police and Figgins' closest known associate, Al Crawford. Detective Stan Pierson of the Raytown Police Department was assigned to find and interview Figgins. Pierson learned that there was an outstanding arrest warrant for Figgins for escape from the Kansas City Honor Farm. Pierson and members of the metro squad attempted to get in touch with Figgins, and left messages wherever they went for him to be in touch with them.

It was the testimony of Detective Pierson that on the afternoon of September 7, 1988, Figgins called him and said that he was "familiar with the fact" that an incident had occurred in Raytown involving Al Crawford and a car chase and a burglary. Figgins said also that he was not aware that there had also been a homicide. Figgins told Pierson that "he would attempt to find out further information regarding what Al had been up to" and was interested to know if Pierson could prevent his return to custody under the escape warrant. Pierson replied that he would see "if that was a realistic possibility." Pierson then arranged for the telephone line at the Raytown station to be traced in case Figgins called again.

The telephone call from Figgins came through at 7:15 p.m. on the following day from a drug store. Figgins was seized there, handcuffed and advised of his rights. An arresting officer, metro squad member Jackson County Deputy Sheriff Richberg, testified that Figgins was arrested for "the investigation of a possible homicide, for questioning in that case." It was deputy Richberg who observed Figgins enter the drug store before the capture. He alerted the other metro squad officers by walkie-talkie that "[t]he possible suspect is here in the store." Officer Willoughby, another member of the metro squad at the arrest, testified that Figgins was then "being treated as a suspect" in that investigation. The pocket knife which was a subject of the suppression motion was taken from Figgins during a search of his person upon his arrest.

It was the testimony of Raytown Detective Pierson that after the arrest he received a message on his radio from one of the arresting officers that Figgins wanted to talk with Pierson, that Figgins had "tentatively made an arrangement" with Pierson. Pierson was instructed to return to the Raytown police headquarters to speak with Figgins. At the first contact between them at the police station, Pierson asked Figgins for his shoes. Pierson and Officer Freemyer then proceeded to interview Figgins. He was again advised under *Miranda* but refused to sign a waiver form. Figgins acknowledged nevertheless that he understood his legal rights under *Miranda*.

At the virtual outset of the interrogation, Figgins asked Pierson: "Can I ask you a question? You think I did it? You think I had something to do with it? You don't take people's shoes, I know you don't take people's shoes." Pierson replied: "You're not the only person's shoe we're taking in regard to this matter." Figgins asked again: "Why, you think I have something to do with it?" Pierson responded that they were there "to find out." And, if so, "to what degree." Figgins told Pierson that "I ain't got no business talking, I didn't have nothing to do with it." Figgins added, "I can help you man, if you work with me." He asked, "If you ain't going to work with me ... does it make any sense to say anything?" Figgins said again: "If I'm a suspect in a murder case, it doesn't make any sense for me to open my mouth." To that Pierson responded: "You're the only one that knows what participation you may have in the whole damn thing." Figgins asked again: "Am I being charged

with anything?" He then complained about his shoes having been taken by the police. The interchange continued in that vein. Pierson asking why Figgins was hesitating in telling what he knew, and Figgins replying that he knew "a bunch of things" about those and other offenses, but before he "talked" he wanted the assurance that he would not be returned to jail under the escape warrant. Pierson then suggested that he could expedite [transcribed "extradite"] the whole matter without more hesitation: "it's just that we've got to cut out the bullshit and proceed." Figgins commenced to talk about what "the guy" told him the night before, that all the police "got is M.O. of a burglary." He added, "I ain't did nothing. If you think I did something, then I'm, I'm shutting up, and I want to see a lawyer, you know."

The interview broke shortly thereafter at 10:05 p.m. and resumed forty-five minutes later at 10:50 p.m. The other officer, Freemyer then entered the interrogation with "Tell us what you know." Figgins responded: "I don't know." Then followed a repartee with Figgins insisting he would not talk unless he was "going to get something out of it," and Freemyer and Pierson telling him that all they knew was that the authorities indicated "they would listen" if Figgins cooperated in the investigation. Freemyer said that if Figgins told them "what you know," they would know "how much help we can give you." Pierson then asked: "Are you the one that actually pulled the trigger, is that the problem here?" Figgins answered, "I ain't shot nobody, brother ..." Pierson responded, "You're not the number one guy?" Figgins answered, "I was with nobody when they shot nobody." Figgins then asked to speak to his father and complained again that he wanted his shoes back. Figgins asked to be returned to his cell, and that interrogation ended. It was then 11:40 p.m.

This initial interview was recorded on tape.

The interview was resumed at 11:15 a.m. on the next day, September 9, 1988, and ended at 1:00 p.m. Only the first twenty minutes of that session were recorded. Pierson gave the *Miranda* warning orally and Figgins acknowledged that he understood it. The questioning started with: "Did Crawford send you back for this gun?" To which Figgins responded: "I don't know nothin' about all that." He then asked if Figgins had any way of putting himself at another location to head this off. Figgins told them he was with his wife and father the night of the shooting, except for a couple of hours. Figgins told them that during that time he "went riding around" in Crawford's vehicle. [He had driven it briefly some days earlier.] To that, Pierson commented: "Okay, that would explain why your fingerprints were in the Buick." Figgins continued to deny that he was in Raytown at the time of the shooting and insisted that he had "nothing to do with it."

Freemyer then asked Figgins for an impression of his teeth in order to eliminate him as a suspect "in this homicide." Figgins repeated what his father had told him, "Don't say nothing until you go on trial and see a lawyer." Freemyer answered: "That certainly is your option." Freemyer asked: "If you are really innocent why not give us the impressions." Figgins then replied: "You are all trying to get me for a murder, that's my life you're playing with now." Pierson followed up: "Let me ask you something, are you trying to tell us you are in the position to where you can't say it because ... I can't think of a way to say it without saying it, because you are involved in a homicide?" Figgins denied he was involved in a homicide, and added: "I can't see myself even talking to you all anymore because you all are steady [sic] trying to burn me and I ain't did nothing." Pierson responded: "Burn or eliminate ... either way ... where did you guys [Figgins and Crawford] go when you went running around?"

Figgins answered. He told them, however, that he was "not signing nothing else." Nevertheless, the interview went on and when asked by Pierson whether he had ever handled Crawford's .22 caliber automatic, Figgins responded, "I've touched al-

most all his guns." He acknowledged also that he had handled the .22 automatic that "looks like a Luger" within recent days so that his fingerprints "may be on it." He acknowledged that he also handled the rounds, the bullets from the weapon. He told the interrogators also that Crawford had borrowed his flashlight and that was why it was found in the Crawford car.

After a break for lunch, the interrogation resumed. Figgins asked the officers whether they found the pop bottle. Pierson said that they did. Figgins wanted to know if "[t]he old man's prints weren't on it." At that point, Pierson once again advised Figgins of his rights under *Miranda*. He was advised also: "You can decide at any time to exercise these rights and not answer any questions or make any statements. Do you understand each of these rights I have explained to you?" Figgins replied that he did and that he wished to talk to them. He then asked: "Where do I sign?" Then they went through the events of the last few days in greater detail.

Figgins began to relate what Crawford had told him the night after the homicide while riding around in the car of Scott Hendren. They had gone to retrieve a wallet taken in the burglary and a firearm, but left behind in the car which had been wrecked in a high speed chase with the police. There was also a pop bottle in the car that Crawford told him came from the deceased man's house. Crawford also described to him how he shot the man in the victim's home. He also told about a pocket knife that Crawford used to open the garage window. The police continued to press Figgins for impressions of his teeth. They wanted them to compare to the dental impressions left on a half-eaten hot dog at the scene of the crime. At 2:36 p.m. Figgins signed a waiver form and the police took a dental impression from him. That interrogation ended and Figgins was taken to the Jackson County Jail.

On September 9, 1988, at 7:30 p.m., three metro squad detectives went to the Jackson County Jail to interrogate Figgins. There had been a positive match between Figgins' teeth and marks left on the hot dog at the scene. Detective Wisner confronted Figgins with that aspect of the physical evidence, and Figgins confessed, "Crawford shot him. I was there." Figgins then gave them the details of the crime. The gun used in the murder had been stolen by Crawford but given to Figgins, used by Crawford, and returned to Figgins. He also described how they gained access to the interior of the home and other details of the crime. They escaped in Crawford's car that was parked on the next block.

Sgt. Kreitler then asked Figgins to repeat his statement in a video confession, and Figgins asked to "work out some kind of deal." Kreitler informed him that only the prosecutor had authority to make such decisions, and later that evening Assistant Jackson County Prosecutor Hall came at Figgins' request. Figgins repeated his confession with some variation and told Hall he would give a video confession if they could work out a deal. Figgins told Hall that he had additional information on "many, many other crimes committed by other people and one additional crime he committed that he had not told police as he wanted to deal."

This sequence of statements as well as the physical evidence obtained from him after the arrest for felony escape form the basis of the Figgins motion to suppress. That motion asserted six distinct grounds. *See* Appendix A. The court found that two grounds were proven, and rejected the rest. The court determined that Figgins had invoked his right to remain silent and his right to an attorney, and that neither request was scrupulously honored. The court determined also that the defendant did not give consent to the officials to take his shoes, knife and dental impressions as physical evidence. The statements and shoes, knife and dental impressions were ordered suppressed from evidence.

The memorandum of findings of fact, conclusions of law and opinion reprised the grounds of the motion, the evidence on those grounds, and the rulings on each ground. The contention that the statements and seizure of the evidence were the result of pretextual or unlawful arrest was

rejected. The contentions that the statements and evidence were given because of police coercion or promises of leniency were also rejected, as was the contention that Figgins was incapable of consent or voluntary waiver of rights because of recent heavy drug use. The order to suppress rests, rather, on holdings that the physical evidence was seized without consent and that the statements were taken from Figgins after he had asserted his right to counsel and at a time when he was a suspect in the crimes under investigation.

The memorandum of findings, conclusions and opinion render the holdings in these terms:

[As to the tennis shoes and knife]

Before the questioning began, the evidence reflects that the defendant's tennis shoes were seized, and that a shoe print comparison was made to see if the shoes seized from the defendant matched shoe prints that were left at the scene of the murder. Also, the defendant's knife was seized in an effort to compare that knife with cuts that were made on a screen window at the scene of the murder. So far as the record before the Court, the defendant apparently did not consent to this seizure.

[As to the dental casts]

I'm going to find that the thought processes of the police officers rose to the level of a suspicion and that they should have obtained counsel for the defendant before the teeth casts were made.

[As to the statements]

On page twenty-six [of the compiled statements taken of Figgins by the police], the defendant makes the following statement ... "If you think I did something, then I'm, I'm shutting up, and I want to see a lawyer, you know."

. . . .

The Court will assume and find that at the time of the foregoing statements, when they began, the defendant was not a suspect and was merely arrested on the escape charge and was being questioned about his knowledge of these burglaries and this murder.

The Court finds the defendant's request for an attorney was not ambiguous or equivocal, but was conditional, e.g., "If you think I did something, then I'm, I'm shutting up, and I want to see a lawyer, you know."

Defendant thus states a condition subsequent to the effect that if the defendant at any time during the questioning became a suspect then under the Miranda decision it would be the obligation of the police at that point to cease questioning, to obtain counsel for the defendant, and to refrain from further questioning of defendant without counsel present.

. . . .

In the case at bar, even if defendant was not a suspect at the time of his condition subsequent—his request for a lawyer as a condition subsequent was made, it's obvious that at some point in the questioning he became a suspect. This is necessarily so, because he made what amounted to a full confession during the questioning.

. . . .

Since the condition subsequent at some point before the defendant confessed necessarily had to be fulfilled, it was incumbent upon the police to cease questioning and obtain an attorney for the defendant. This was never done. As a result, defendant's right to cut off questioning was not honored and the motion to suppress must therefore be sustained.[2]

**2.** Although the order to suppress rests upon two specific findings, that the right to remain silent and the right to an attorney invoked by Figgins were not scrupulously honored, the memorandum opinion confines the rationale of decision to the infringement of the right to counsel. It is evident that the term—"defendant's right to cut off questioning was not honored"—in the final flourish of the order—relates to failure of the police to honor Figgins' right to counsel, and not to his right to remain silent. The distinction is of some consequence, both as a matter of trial court finding and as well as appellate court review, since the proof of waiver is more onerous in the case of right to counsel. *See,* among others, *Michigan v. Jackson,* 475 U.S. 625, 634 n. 9, 106 S.Ct. 1404, 1410 n. 9, 89 L.Ed.2d 631 (1986), and *Edwards v. Arizona,* 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981).

The memorandum rests its legal conclusions on *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), and *Smith v. Endell*, 860 F.2d 1528 (9th Cir.1988), *cert. denied*, —— U.S. ——, 111 S.Ct. 510, 112 L.Ed.2d 522 (1990).

█ In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that once a person in custody invokes the right to counsel, interrogation must cease until an attorney is present. *Id.* at 474, 86 S.Ct. at 1628. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), gave force to these warnings by the bright line rule that after an accused requests counsel, all questioning must cease "until counsel has been made available to him." *Id.* at 484, 101 S.Ct. at 1885. Furthermore, when a person has invoked the right to have counsel present during custodial interrogation, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* There is a waiver of counsel in such a case only if the person himself initiates "further communication, exchanges, or conversations with the police." *Id. Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489, dispelled any doubt that when counsel is requested, not only must interrogation cease, but also "officials may not reinstate interrogation without counsel present, whether or not the accused has consulted with his attorney." *Id.* at ——, 111 S.Ct. at 491.

The trial court rested the order of suppression on the authority of *Minnick* as the culmination of *Miranda, Edwards* and other decisions of the United States Supreme Court relating to the right to counsel of a person at custodial interrogation. The order of the trial court also rests on the theory adopted in *Smith v. Endell*, 860 F.2d 1528, that a request for counsel which becomes operative if the interrogators regard the person in custody as a suspect in the crime under investigation, although conditional, is sufficient as a matter of constitutional law to invoke the right to counsel.

The state does not dispute the authority of *Minnick* or its holdings. The state does question the validity of the conditional request for counsel both as a principle of Fifth Amendment constitutional law, as well as a precedent. It questions also the finding that the statements by Figgins were sufficient as a matter of fact and law to invoke his right to counsel.

█ In the review of the ruling of the trial court on a motion to suppress, the inquiry is confined to whether the decision is supported by substantial evidence. *State v. Feltrop*, 803 S.W.2d 1, 12[25] (Mo. banc 1991), *cert. denied*, —— U.S. ——, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). In that inquiry we defer to the opportunity of the trial court to judge the credibility of the witnesses. *Id.* In the determination of the sufficiency of the evidence, the facts and reasonable inferences are taken in the light most favorable to the order challenged on appeal. *State v. Blair*, 691 S.W.2d 259, 260[1] (Mo. banc 1985). The court of review will nevertheless correct a ruling on a motion to suppress that rests on a manifest error of law. *State v. Riggs*, 586 S.W.2d 447, 449[3, 4] (Mo.App.1979).

The parties agree that if the person in custody requests counsel, the police interrogation must cease and may not resume until counsel has been made available to the person. The issue here is whether Figgins made a request for counsel, whether he "state[d] that he want[ed] an attorney." *Miranda*, 384 U.S. at 474, 86 S.Ct. at 1628. In such case, the interrogation must cease until an attorney is present. *Id.*

In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, the accused responded to interrogations, but then sought to "make a deal." His statement to the police, "I want an attorney before making a deal," was an assertion of the right to counsel and sufficed as an exercise of the right to remain silent and to be free of interrogation until consultation with a lawyer. *Id.* at 485, 101 S.Ct. at 1885. The response of the suspect, "Uh, yeah. I'd like to do that," to the officer's advisement of his right to counsel, was also a clear request for counsel in *Smith v. Illinois*, 469 U.S. 91, 93, 105 S.Ct.

490, 491, 83 L.Ed.2d 488 (1984). The response, "[T]hat is a question I'd rather not answer until I talk to [my attorney]," to the question by the police as to whether the accused would be willing to submit to the lie detector test, was also a request for counsel. *Solem v. Stumes*, 465 U.S. 638, 640, 104 S.Ct. 1338, 1340, 79 L.Ed.2d 579 (1984). In the most recent case, *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), the response, "Come back Monday when I have a lawyer," to the reminder by the federal agents that he did not have to answer questions without a lawyer present, was also sufficient as a request for counsel. *Id.* at ——, 111 S.Ct. at 488.

It is the legal theory in *Smith v. Endell*, 860 F.2d 1528, that a *conditional* request for counsel suffices as a matter of constitutional law to invoke the right to counsel, which the trial court adopts as the rationale for the order to suppress. In that case Smith, arrested for possession of cocaine, was asked by troopers if he shot his supplier [to whom he owed money]. Smith replied, "Can I talk to a lawyer? At this point, I think maybe you're looking at me as a suspect, and I should talk to a lawyer. Are you looking at me as a suspect?" The troopers told him that it would not be fair to him to say that they weren't. Smith then remarked: "Because if you are, it's ... it's a serious charge and I think I should have counsel, if that's where ... what you're ... where you're coming from, just tell me if you are." The troopers reminded Smith that he himself had noted that anyone on the supplier's list who owed him money for drugs would have reason enough to kill him. Smith responded, "Yeah. I admitted my name is probably in it." The troopers then reminded Smith that he had been advised of his right to counsel and should not hesitate to get one, but if he wanted to talk to them about the supplier's dealings and the murders, they would talk with him. Smith then said: "I don't know if I need one or not. That's why I'm trying to make my mind up, if I need to go that route for myself, you know." The interview continued and Smith then confessed to the murders.

The trial court denied Smith's motion to suppress the confession, finding that his two references to a lawyer were merely affirmations that he had the right to counsel, that he was undecided whether he needed one, and decided to "go forward" without one. The state court of appeals affirmed. On habeas corpus review in the federal court, the Ninth Circuit determined that the initial request for counsel was not ambiguous, but conditional. *Id.* at 1531. "[It] was clear enough: if the troopers regarded him as a suspect in the [murders], he wanted an attorney." The court concluded that "[t]he troopers could not have mistaken Smith's meaning." *Id.* The court suppressed the confession on the basis of the *per se* rule in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, that, when the accused in custody invokes the right to have counsel present, interrogation by the police must cease until counsel is made available, unless the accused initiates further communication with the police.

The memorandum opinion of the trial court found the reasoning of the Ninth Circuit majority persuasive, reasoning uncontradicted or contravened by other authority, and adopted its thesis of conditional request for counsel as a valid principle of constitutional law. We need turn no further than to the dissent in *Smith v. Endell* to glimpse the nettled path that spreads out from such a premise. It dims the bright line rule laid down in *Miranda* and *Edwards* that upon the request by the accused for an attorney the police interrogation must cease. The merit of which lies in "the clarity of its command and the certainty of its application." *Minnick v. Mississippi*, 498 U.S. at ——, 111 S.Ct. at 490. Its certainty is designed to prevent police from hectoring a defendant into waiving previously asserted *Miranda* rights. *Id.* at ——, 111 S.Ct. at 489. It is thus a rule that "conserves judicial resources which would otherwise be expended in making difficult determinations of voluntariness, and implements the protections of *Miranda* in practical and straightforward terms." *Id.* at ——, 111 S.Ct. at 489–90.

The right to counsel jurisprudence now recognizes two categories of request, each with a rule of certain application. An unequivocal request for counsel mandates " 'the relatively rigid requirement that interrogation must cease.' " *Id.* at ——, 111 S.Ct. at 490; *State v. Bittick*, 806 S.W.2d 652, 655 (Mo. banc 1991). An ambiguous request for counsel, however, does not cut off interrogation. Questions may continue, but only to clarify the ambiguity. *United States v. Fouche*, 833 F.2d 1284, 1287 (9th Cir.1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988).

The introduction of yet another category, the conditional request, into the law of request for counsel at custodial interrogation, not only complicates the issue for the adjudicator but accomplishes no protection for the person interrogated. That is because it diverts the inquiry from the state of mind of the suspect to the state of mind of the police, and so obscures the bright line of procedures already established that guide the interrogator as to whether the suspect has requested counsel. *See Arizona v. Roberson*, 486 U.S. 675, 687, 108 S.Ct. 2093, 2101, 100 L.Ed.2d 704 (1988). The state of mind of the person in custody as a request for counsel is objectively discernible from the words of request, and so is fathomable. *See, e.g. Edwards*, 451 U.S. 477, 101 S.Ct. 1880; *Solem*, 465 U.S. 638, 104 S.Ct. 1338; *Minnick*, 498 U.S. 146, 111 S.Ct. 486; *Bittick*, 806 S.W.2d 652. The state of mind of the police as to whether they regard the person under interrogation as a suspect is entirely subjective, and so not fathomable in the usual adjudicative sense. It would entail the proof of not only the information in the hands of interrogator as to the "condition" [here, whether at any particular time in the interrogation the person in custody was regarded as a suspect], but also, by the usual presumption that attends right to counsel issues, the imputation to one state actor the knowledge of other state actors, whether actually known or not. *Michigan v. Jackson*, 475 U.S. at 634, 106 S.Ct. at 1410. Thus it tends into byways of inquiry diffuse and without end.

The predictable inconclusiveness of such an undertaking is manifest from the adjudication before us for review. There is no finding that at the time the "conditional request" for a lawyer was made the interrogators regarded Figgins as a suspect. The rationale of the order to suppress is that the conditional request for a lawyer was not as to a *present condition*—that is that the interrogators then regarded Figgins as a suspect—but rather as to a *condition subsequent*.[3] In the articulation of the memorandum decision, the request for counsel

> ... states a condition subsequent to the effect that if the defendant at any time during the questioning became a suspect then under the Miranda decision it would be the obligation of the police at that point to cease questioning, to obtain counsel for the defendant, and to refrain from further questioning of defendant without counsel present.

There is no finding, however, that the interrogators regarded him as a suspect at any specific time subsequent to the "conditional request" and prior to his confession. In the words of the court [per the memorandum decision]:

> Well, see, this is the tricky part of the whole case, and that is that there does not appear to be one single moment in time at which the conditions subsequent springs into being. There is nothing in the record from which I can tell when the detectives' thought processes evolves into a suspicion.

---

**3.** It should be noted that *Smith v. Endell*, 860 F.2d 1528, relied on by the trial court as the primary authority for the adoption of the "conditional request" for counsel thesis, dealt with a present condition, and not a condition subsequent. In that case the troopers regarded Smith as a suspect in the murder of the drug supplier and told him so. Thus, the condition was already fulfilled, and so under the principle of that case the invocation of a lawyer was, presumably, immediately effective. In the case now under review there was no such conclusive evidence that at the time of the "conditional request" the officers already suspected Figgins of the crime under investigation, nor did the trial court find that Figgins became a suspect at any specific time before he confessed.

Rather, the order of suppression rests on the assumption that "at some point in the questioning [Figgins] became a suspect. This is necessarily so, because he made what amounted to a full confession during the questioning." But it does not follow that Figgins was a suspect because he confessed, or that he confessed because he was a suspect. Persons in custody who are not suspects also confess. The court concluded, nevertheless

> Since the condition subsequent at some point before the defendant confessed necessarily had to be fulfilled, it was incumbent upon the police to cease questioning and obtain an attorney for the defendant. This was never done. As a result, defendant's right to cut off questioning was not honored and the motion to suppress must therefore be sustained.

■ The order to suppress rests on the manifest error of law that attributes to a conditional request for counsel an unambiguous invocation of the right to counsel under the Fifth Amendment.[4] The order to suppress is erroneous even on its own terms as without support in the evidence. The full context of the utterance by Figgins, to which the findings and order of the trial court attribute the quality of a "condition subsequent" request for counsel during custodial interrogation, shows that after Figgins laid down the "condition subsequent," he continued without interruption to invite further exchanges with the police.[5] The balance of that response was a clear invitation to the police to resume discussions with him personally—after he was taken to the Jackson County Jail at the expiration of the 20 hour limit, almost at hand, of detention without formal arrest—about a "deal that would avoid jail time under the escape warrant." The immediate response of the police, "I don't know that there would be a re-interview," was to that very invitation.

■ It is evident that Figgins elected to proceed without counsel, his "condition subsequent" request notwithstanding. It is within the power of a person who invokes the right to counsel during custodial interrogation to countermand the exercise of that right. *Edwards v. Arizona*, 451 U.S. at 485, 101 S.Ct. at 1885. It is accomplished when the person in custody "himself initiates further communication, exchanges, or conversations with the police." *Id.; Minnick v. Mississippi*, 498 U.S. at ——, 111 S.Ct. at 490; *State v. Bittick*, 806 S.W.2d at 655. The statements by Figgins, waiver as to the dental casts, and the confession that followed were lawful and admissible evidence.

The part of the order to suppress the statements by Figgins and the waiver as to the dental casts is reversed.

There remains the question of the validity of the order to suppress from evidence the knife and shoes taken from Figgins while in detention under the warrant for felony escape. The knife was to be compared with cuts that were made on a screen window at the scene of the murder. The prints of the shoes were compared with the

---

**4.** Those few cases that have noticed the *Smith v. Endell*, 860 F.2d 1528, decision have given no effect to the notion of conditional request as an invocation to the right to counsel during custodial interrogation. *See People v. McReavy*, 436 Mich. 197, 462 N.W.2d 1, 12 n. 28 (1990), and *Holland v. State*, 587 So.2d 848, 857 n. 5 (Miss. 1991).

**5.** The questions and answers that preceded were disjointed and nonsequential as to subject matter. The immediate question was: "What car are we talking about?" The response that contained the "condition subsequent" request for counsel was:

> I tell you what. I'll tell you like the guy told me last night, all you got is M.O. of a burglary, and because that M.O. matches the other M.O., that's why the investigation start-

ed. See, I'm no dumby [sic], and I know ... I'm not being no smart ass here, I know what's what man. I ain't did nothing. *If you think I did something, then I'm, I'm shutting up, and I want to see a lawyer, you know.* After these 20 hours are up and you let me go back down to Kansas City Police Station, and they start sending me back to the penitentiary, and you want to talk to me then about getting me out, then we'll do it. I ain't trying to be no smart ass or nothing, but all I want to do is not want to go back to jail.

The order to suppress treats only the excerpt that constituted the "condition subsequent" request for counsel. It does not consider the legal effect of the uninterrupted balance of that response.

prints of shoes left at the scene of the murder.

The motion to suppress included grounds that the seizure of the physical evidence were results of a pretextual and unlawful arrest, Figgins' incapacity to give the physical evidence because of recent heavy drug use, and that his consent to give the physical evidence was not voluntary because of police threats and coercion and promises of leniency. The court specifically found that the physical evidence taken was not the result of pretextual arrest, or of threats, coercion or promises of leniency. The court did find, simply: "I don't think [Figgins] ever did give consent to take the physical evidence." The court recapitulated for the parties: "[Figgins] did sign the consent form on the teeth, but not on the knife or the tennis shoes ..."

There is no need in law for consent before a police officer who arrests under a warrant or with probable cause to search the person of an arrestee for weapons. *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). The law observes a distinction, however, between the search of an arrestee and the seizure of the articles found. That is because the Fourth Amendment protects two types of expectations, one involving searches, the other seizures. "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984); *State v. Gilpin*, 836 S.W.2d 49 (1992).

Where a person is lawfully arrested, either with or without an arrest warrant, the officers have the right, without a search warrant, to make a contemporaneous search of the person of the arrestee for weapons, for contraband, for the fruits of the crime, or implements used to commit the crime for which the arrest was made. *Preston v. United States*, 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964). To ensure the security of the property against arbitrary seizure, there must be "a nexus ... between the item to be seized and criminal behavior." *Warden v. Hayden*, 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782 (1967). Thus, if as an incident to lawful arrest, the seizure must be as to "articles which have evidentiary value in connection with the crime for which the suspect is arrested." *State v. Redding*, 357 S.W.2d 103, 107[5, 6] (Mo. 1962). There must be probable cause to believe "that the evidence sought will aid in a particular apprehension or conviction." *Warden v. Hayden*, 387 U.S. at 307, 87 S.Ct. at 1650.

Figgins was in custody under an arrest warrant for felony escape. There is no contention that the knife or the shoes seized from his person were contraband, or the instrumentality or fruits of felony escape—the crime for which he was arrested. There is no contention or proof that the police had probable cause to believe that there was any connection between those articles and criminal behavior. *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642. Those articles were not evidence of the crime for which Figgins was arrested nor was there probable cause for the police to believe that they were, when seized, evidence of any other crime.

The knife was removed from Figgins during a search of his person as an incident to arrest under the warrant for felony escape, and so came into the possession of the police by lawful means. His original expectation of privacy in the knife, therefore, was already frustrated. Then, from what appears in the record, the pocket knife was placed in the property locker of the Raytown Police Department. The official police report of the inventory of "recovered property of Kenneth E. Figgins" recites: "It will be compared with window screens cut in burglaries with a similar M.O. to this homicide." There is no evidence in the record, however, that there was a comparison, or if there was, how accomplished.

"The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation

of privacy has not already been frustrated." *United States v. Jacobsen,* 466 U.S. at 117, 104 S.Ct. at 1658. The fact of a pocket knife with a yellow handle and three blades was already known to the police from the lawful seizure and inventory of the property. That information was learned by visual inspection and so implicated no expectation of privacy not already frustrated by what the lawful search disclosed. *Id.* If the officers indeed made a comparison of the knife blades and the cut in the window, and the comparison was only visual, then the Fourth Amendment would not be implicated. *Id.* That is because there would no violation of either any expectation of privacy or expectation of the security of the property against arbitrary seizure. Nor does the record, even by implication most favorable to the order to suppress, suggest that Figgins was prompted to confess by evidence that the marks on the window screens at the homicide site were produced by his knife. There was simply no evidence at all that anything was learned by the police, not already known or observable by them from the removal of the weapon at the search of the person, by any arbitrary seizure of the knife.[6]

The specific finding by the court on the motion to suppress that Figgins did not consent to the seizure of the knife, therefore, is irrelevant. There was no evidence that the information that connected the knife to the screens came to the police other than by what was observable at the lawful search.

The order to suppress the knife is reversed.

The specific finding by the court on the motion to suppress that Figgins did not

consent to the seizure of the shoes, on the other hand, is affirmed. The tennis shoes were taken from Figgins, not as a matter of regular inventory, but at the outset of interrogation on September 9, 1988. The police wanted them for comparison with the footprints found at the murder scene. The police testified that Figgins relinquished them voluntarily. Figgins denied that he gave them freely and thereafter repeatedly asked for their return. The trial court found that they were taken from Figgins without his consent. That finding was supported by substantial evidence.

We conclude that the taking of the shoes was an arbitrary and unlawful interference with Figgins' possessory interests in that property. There was neither "nexus ... between the item to be seized and criminal behavior," nor consent to their relinquishment. *Warden v. Hayden,* 387 U.S. at 307, 87 S.Ct. at 1650. The order to suppress the shoes from evidence is sustained.[7]

The part of the order to suppress the shoes from evidence is affirmed.

The order to suppress is reversed in part and affirmed in part.

All concur.

### APPENDIX A

MOTION TO SUPPRESS STATEMENTS AND PHYSICAL EVIDENCE AND SUGGESTIONS ·IN SUPPORT THEREOF

. . . .

1. The defendant's statements and the physical evidence seized from defendant were the direct result of a pretextual and unlawful arrest.

---

6. On the motion to suppress Figgins presented as a witness Ralph Baney, firearm and toolmark examiner, with the Kansas City, Missouri Police Department. Counsel examined Baney as to comparison of the shoes taken from Figgins with shoe prints left at the scene of the crime, but did not touch on any comparison between the knife taken from Figgins upon arrest and the cuts in the window screens at the scene of the homicide. There was no mention of the knife at all in the course of his examination and testimony.

7. The purpose of the motion to suppress the tennis shoes is not apparent. The testimony of the toolmark examiner expert, Baney, was that the shoes taken from Figgins were compared to photographs of shoe prints found at the scene of the crime, but that they did not match. It may be that the evidence on this phase of the motion to suppress was directed to the contention that the entire interrogation as well as the incidents of the search were illegal as the results of an arrest entirely pretextual.

2. The defendant invoked his right to remain silent and this request was not scrupulously honored.

3. The defendant invoked his right to an attorney and such request was not scrupulously honored.

4. The defendant did not voluntarily waive any of his constitutional rights before speaking with law enforcement officials or giving physical evidence because he *was incapable of doing so due to his recent heavy intravenous ingestion of narcotics* and resultant lack of sleep for several days preceding his arrest.

5. The defendant's statements to police and his "consent" to give physical evidence were not voluntarily given because the defendant was threatened and coerced by said officials.

6. The defendant's statements to police and his "consent" to give physical evidence were not voluntarily given because said officials used promises of leniency to induce the defendant to make a statement.

